# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE

March 30, 2021 Session

## STATE OF TENNESSEE v. MATTHEW THOMAS DOTSON

**Appeal from the Criminal Court for Roane County**
**No. 2012-CR-120    Michael S. Pemberton, Judge**

_____

### No. E2019-01614-CCA-R3-CD

_____

Matthew Thomas Dotson ("Defendant") appeals his Roane County convictions for first degree felony murder in the perpetration of aggravated child abuse, first degree felony murder in the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect, for which he received an effective sentence of life without parole. Defendant contends that: (1) the trial court erred in denying his motion to suppress his May 3, 2012, statements to law enforcement; (2) the State improperly elicited testimony from a witness regarding Defendant's prior drug usage and the trial court abused its discretion by denying Defendant's request for a mistrial following such testimony; (3) the trial court abused its discretion by admitting photographs of the victim into evidence; and (4) the evidence was insufficient to support his convictions. Following a thorough review, we affirm the judgments of the trial court but remand for entry of amended judgments reflecting proper merger of offenses as outlined below and for the imposition of sentences in Counts 4 and 5.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

M. Jeffrey Whitt and Richard L. Gaines (on appeal), Knoxville, Tennessee, and A. Philip Lomonaco and Bailey Harned (at trial), Knoxville, Tennessee, for the appellant, Matthew Thomas Dotson.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Russell Johnson, District Attorney General; and Robert Edwards and Alyson H. Kennedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

This appeal arises from the starvation death of two-year-old Clifford W. Dotson ("the victim") in Kingston in May 2012. The Roane County Grand Jury subsequently indicted the victim's parents, Defendant and Amanda Ann Dotson ("Mrs. Dotson"), for first degree premeditated murder, first degree felony murder in the perpetration of aggravated child abuse, first degree felony murder in the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect. Mrs. Dotson entered a guilty plea in connection with the case and then testified against Defendant at his 2019 trial.

### *Motion to Suppress Defendant's Statements*

Prior to trial, Defendant filed a motion to suppress statements he made to detectives on May 3, 2012, and May 7, 2012. At a hearing on the motion, Detective Brian Walker with the Roane County Sheriff's Office (RCSO) testified that, a little after 5:00 a.m. on May 3, 2012, he learned that Detective Arthur Wolff was at the hospital with the deceased victim and that Detective Wolff needed him to respond to a residence on Lerchen Road in Kingston. Detective Walker explained that, when he arrived at the scene, he spoke to officers there and learned that Defendant, the deceased child's father, was inside the residence. Detective Walker noted that there was "a small child coming in and out of the residence playing."

Regarding his initial interaction with Defendant, Detective Walker stated:

> I asked if I could come in and speak to him. [Defendant] said yes. I noticed there was a large box I think that contained a grill or something sitting on the couch. [Defendant] advised me that I think his mother or mother-in-law . . . g[a]ve him the grill. I think he asked me to sit down. I sat in one of the chairs. He sat on the couch and I just basically asked him to tell me kind of what was going on and how -- you know, how it had come for me to be there and asked him what had happened that evening of that night.

Detective Walker stated that Defendant was "alert" and "coherent" and that Defendant did not appear to be in a panic.

According to Detective Walker, Defendant said that he had been at his parents' house in Jefferson County and had gotten home late. Defendant said that, when he arrived at the residence, he "looked in" on his two children and Mrs. Dotson and that everyone

appeared to be asleep. Defendant got a snack and went to the "computer room" to play video games. Defendant said that, after playing video games for a while, he noticed that he had not heard any noises from the victim's room, so he went to the room to check on the victim, "at which point he discovered that [the victim] didn't appear to be breathing." Defendant told Detective Walker that "everything was kind of a blur" and that he "was kind of in shock" when he found the victim unresponsive. Defendant said that he woke up Mrs. Dotson and that "they had an argument over not feeding the child or not taking care of the child." Defendant stated that Mrs. Dotson took the victim to the hospital and that he stayed at home with their six-year-old son, L.D.[1]

Defendant told Detective Walker that, about a month before, he noticed that the victim was losing weight. He said that, when he asked Mrs. Dotson about it, she said that "she would take care of it." Defendant said, however, that to his knowledge, Mrs. Dotson had not taken the victim to the doctor. Defendant said:

> I asked her how he was doing[,] and she said that she was working on it. She told me she had been feeding him[,] and he has been eating [from] a bottle. I saw that there were -- I saw when I got home -- when I would get home that dishes and bottles were dirty so I thought that he had been eating and drinking [from] bottles.

Detective Walker testified that, while inside the residence, he heard the washing machine cycle end and that he asked Defendant "who turned the washer on because from the initial call and the time [Detective Walker] got on the scene it had been a while." Defendant initially said that Mrs. Dotson turned on the washing machine, but when Detective Walker pointed out that too much time had passed since she left for the hospital, Defendant stated that he had turned it on because "he was afraid that if DCS came and saw the dirty linens that the other child may be taken into DCS custody." Defendant told Detective Walker that he had been away from the residence a lot, working odd jobs for family members. Defendant advised that he left the residence in the mornings before anyone woke up and that he got home after everyone was asleep.

Detective Walker testified that he reduced Defendant's statement to writing and that Defendant signed the statement at 7:10 a.m. Defendant also consented to a search of the residence. Detective Walker testified that he photographed the residence and collected "blue/green PJs . . ., [a] white crib cover, a blue blanket, small blue blanket with balls on it. Blue small bed cover with cars on it and . . . orange sweat pants." He also collected "some linens, clothing, that kind of stuff out of the washer[.]" Detective Walker said that he was not sure what Defendant was doing while he was searching the residence. He

---

[1] It is the policy of this court to identify minors by their initials only.

recalled that Defendant went outside several times to smoke and to check on L.D. Detective Walker said that Defendant's parents were outside the residence as well. Detective Walker recalled that, when he arrived at the residence, there were two or three patrol officers at the scene but that no one from the Department of Children's Services (DCS) was there. Detective Walker testified that he never told Defendant that Defendant could not go outside or leave the residence. He stated, "I think the only restrictions I asked is if he needed to come in the house to not come into the other rooms where I was looking because I was walking around and . . . didn't want basically somebody walking in behind me[.]" Detective Walker recalled that he introduced Defendant to Detective Wolff when Detective Wolff arrived at the residence.

On cross-examination, Detective Walker said that the other two or three officers at the residence were "in and out" while he was speaking to Defendant. Detective Walker said that he learned from Detective Wolff that the victim appeared to be malnourished. Detective Walker stated, however, that he had not known the cause of the victim's death when speaking to Defendant and that his investigation was to determine if a crime had been committed.

Detective Walker denied telling Defendant that he could not go outside and talk to his parents. Detective Walker saw Defendant go outside where Defendant was helping take care of L.D. He further stated, "I don't recall ever telling the patrol officers anything to do with [D]efendant as far as leaving or not leaving or anything like that." Detective Walker denied telling Defendant that he had to stay at the residence to speak to the DCS worker. The following exchange then occurred:

> Q. And you knew that [Defendant] had to stay there for DCS to interview him?
>
> A. No, at that point, the only thing I was concerned about was the other child's safety and if he was the father, he could go -- I mean, I didn't have any reason to keep him there at that point.
>
> Q. So you're saying that he could have just got up and walked out and said I'll see you guys later, hopped in his truck?
>
> A. Yeah.
>
> Q. Drove away?
>
> A. Yeah, if he wanted to leave, he was free to go.

- 4 -

Q. Did you tell him that?

A. I don't know that I told him that.

Detective Walker recalled that, when searching the residence, he found a bottle in the crib where Defendant said the victim had been sleeping. Detective Walker noticed that the bottle of milk was "cold to the touch like refrigerator cold, not just room temperature cold." He asked Defendant about the bottle, and Defendant said that he got the bottle and tried to feed the victim.

RCSO Deputy B.J. Walker testified that, on May 3, 2012, he responded to the scene on Lerchen Road around 4:45 a.m. to assist another deputy. When he arrived, Defendant was sitting on a couch in the living room. Deputy Walker said that he was at the residence for a couple of hours and that he saw Defendant "going in and out" from the living room to the porch several times. Deputy Walker said that his focus was on L.D. and that he talked to and played with the child. Deputy Walker testified that he did not speak to Defendant while at the residence. Deputy Walker did not hear Defendant ask if he could leave or say that he "needed to get out of there[.]"

Detective Arthur Wolff of the RCSO testified that, on May 3, 2012, he received a call advising him about "a deceased young child at the hospital in Lenoir City and that patrol units had been sent to a residence in Roane County as well." Detective Wolff responded to the hospital and asked Detective Walker to go to the residence on Lerchen Road. While at the hospital, Detective Wolff spoke to Mrs. Dotson, and she consented to a search of her vehicle. Detective Wolff then took photographs of the deceased victim and the victim's car seat, and he searched Mrs. Dotson's vehicle.

Detective Wolff recalled that, after leaving the hospital, he drove to the scene on Lerchen Road. Upon arrival, Detective Wolff spoke to Detective Walker, who stated that he had spoken briefly to Defendant and obtained both verbal and written consent for a search of the residence. Detective Walker told him that Defendant had given a written statement, but Detective Wolff did not read the statement at that time. Detective Wolff entered the residence and found Defendant sitting in the living room on a couch. Detective Wolff testified:

> I introduced myself, gave my name, told them I was a detective with the sheriff's office. I understood that his son was deceased[,] and we were looking into the circumstances about what happened and that I had spoken to Detective Walker briefly and that Detective Walker had told me that he . . . had given permission to search the residence. I wanted to verify that with him even though I had already seen the [consent to search] form. He said

- 5 -

that he had. And I then asked him if he had any objections if I looked around and he said he did not.

After looking around the residence, Detective Wolff spoke to Defendant again and asked him "what was going on in life [that] brought us all to be here." Detective Wolff testified:

> [Defendant] said he had been out of work for a couple of years, had been looking for work, had been back and forth from his parents' house doing some odd jobs there, but he comes home each night. He would look in on the kids, make sure they were okay, but basically he felt that it was [Mrs. Dotson's] job to feed and care for the children. And that about a month prior to that he had noticed the [victim] . . . looking sickly or not well, so he had asked [Mrs. Dotson], you know, are you taking him to the doctor? Are you taking care of him? He said that she had said yes.

Detective Wolff testified that he spoke to Defendant a second time several days later, on May 7, 2012. He said that he learned Defendant was staying at his parents' house in Jefferson City. Detective Wolff called the house and spoke to Defendant's mother and asked if Defendant would be willing to talk to him again. Defendant's mother told Detective Wolff that Defendant was willing to speak with him further, so Detective Wolff drove to Defendant's parents' house. Upon arrival, Defendant's mother, Defendant, Detective Wolff, and some additional family members sat on lawn furniture in the front yard. Detective Wolff testified:

> I told [Defendant] that I don't like [to] trust [] my memory and that I would like to take a formal statement from him . . . . I'd like to go over what we call a rights form with him, and we'd go over each of those rights and[,] if he didn't understand anything, let me know and I would explain it the best I could.

Detective Wolff stated that he reviewed the *Miranda* rights waiver form with Defendant and that Defendant signed the form and agreed to speak to him. When asked about Defendant's demeanor during the interview, Detective Wolff said that Defendant was "a little bit upset" but calm and coherent. After interviewing Defendant, Detective Wolff asked Defendant to write out his statement. Although Defendant began writing his statement, he eventually asked Detective Wolff for help, so Detective Wolff "offered to write down what [Defendant] stated." Detective Wolff identified the written "statement of facts" that contained a narrative of Defendant's statement, which Defendant signed. This second written statement was substantially similar to the written statement Defendant provided to Detective Walker.

When asked why he did not provide Defendant with a *Miranda* warning before speaking to Defendant on May 3, 2012, Detective Wolff explained, "I was conducting an investigation[,] but [Defendant] was not in custody and there was not an interrogation." Detective Wolff testified that he saw Defendant walk in and out of the residence on Lerchen Road several times when he was there on May 3. The following exchange then occurred:

Q. Did you tell [Defendant] he could -- he was free to leave?

A. At one point shortly after I got there, he asked I believe if he could have a cigarette and I told him words to the effect, sir, you're free to do whatever you want.

Q. Okay. Did he tell you that he wanted to talk to his parents?

A. I know he was outside with them at one point.

Q. Talking to them?

A. They were together. I couldn't tell you whether they were talking or not.

Q. And when you say together, I mean, were they handshake distance?

A. Close proximity; couple of feet.

Q. But you didn't see whether they were talking or not?

A. I wasn't paying that much attention.

Q. Did you restrict who[m] [Defendant] could talk to?

A. No, sir.

Q. Did you hear anybody else restrict who[m] he could talk to?

A. No, sir.

Defendant testified that he and Mrs. Dotson had two children together. He said that he had lived with them at the residence on Lerchen Road until December 2011, when he had moved in with his parents in Jefferson City. Defendant testified that he left the residence on Lerchen Road because "it was a very hostile environment" and that he and

- 7 -

Mrs. Dotson argued often. Defendant said that, on the night of May 2, 2012, Mrs. Dotson called him at his parents' house around 7:00 or 8:00 p.m. and said that the children needed food. A few hours later, Defendant stopped at Walmart in Loudon and picked up baby food and a few other items and then drove to the residence on Lerchen Road. Defendant said that, when he found the victim deceased, he woke up Mrs. Dotson and argued with her about whether she had been feeding the victim. Defendant then took L.D. into the computer room, and Mrs. Dotson took the victim to the hospital.

Defendant explained that he began cleaning up the residence and started a load of laundry that Mrs. Dotson put in the washing machine before she left for the hospital. He said that he cleaned up the residence because he "panicked" and was worried about losing L.D. too. Defendant said that he called his parents and that they arrived at the residence shortly after the first two patrol deputies. Defendant stated that his parents were outside and that he asked to speak to his parents but was told that "they needed [him] to wait inside at that point for [] Detective Walker to arrive." Defendant testified that, when Detective Walker arrived, the detective sat in the living room with Defendant and talked to him "for a while[.]" Defendant explained that he gave Detective Walker consent to search the residence. Defendant stated that Detective Walker did not inform him that he had a right to remain silent or that he could refuse to consent to the search. Defendant recalled that he sat in the living room with a uniformed deputy "right next to [him]" while Detective Walker conducted the search. Additionally, he said that there were two uniformed deputies present in the living room when Defendant spoke to Detective Walker. Defendant testified that he did not feel that he could get up and leave the residence at that point. Defendant said that he repeatedly asked to speak to his parents but that Detective Walker told him he needed to "stay inside" and talk to Detective Walker. Defendant said that, before Detective Walker arrived, he was able to go out on the porch to smoke. He stated that he was asked to stay inside the residence during the search in case Detective Walker "had any questions[.]" Defendant said that, during this time, he was in a state of shock and that he was "really susceptible to whatever they wanted me to do" and that he was "trying to process everything that had happened."

Defendant said that he was eventually allowed to go back outside and smoke around 11:00 or 11:30 a.m., after DCS employees arrived. He recalled that he asked a uniformed deputy if he could go smoke outside and that the deputy followed him outside. When Defendant again asked if he could speak to his parents, the deputy said that he needed to wait because there was "an ongoing investigation[.]" Defendant said that his movement was restricted and that he felt like he was a suspect and "under investigation." He said that he believed he would be arrested if he attempted to leave the residence.

Regarding his conversation with Detective Wolff on May 7, Defendant testified that Detective Wolff drove out to his parents' house. Defendant stated, "We sat down and

talked for a little bit, went over the statement and that was pretty much it." Defendant agreed that Detective Wolff went over the *Miranda* rights waiver form with him and that he signed the document. Defendant claimed, however, that Detective Wolff advised him of his rights *after* obtaining Defendant's written statement. Defendant said that Detective Wolff wrote out his statement because Defendant was so upset, but Defendant agreed that he reviewed, signed, and dated the statement. When confronted with the times the *Miranda* rights waiver form and statement were signed, Defendant acknowledged that the documents indicated that the rights waiver form was signed before the statement. Defendant said that he recalled filling in the time on the rights waiver form but stated that he did not fill in the time on his statement.

Suzanne Dotson, Defendant's mother, testified that Defendant called her on May 3, 2012, after finding the victim deceased. Defendant's mother recalled that she and her parents drove to the residence on Lerchen Road and that, when they arrived around 4:30 or 5:00 a.m., there was a deputy standing next to Defendant on the porch. She said that she was not allowed to speak to Defendant. She stated, "[W]hen we got there I wanted to get out of the car . . . but one of the cops said that we couldn't get out of the car at this time." Defendant's mother testified that, when Defendant went back inside the residence, she was allowed to get out of the car to care for L.D. She said that Defendant later came out onto the porch to smoke but that she was still unable to talk to him. She said that she was not allowed to speak to Defendant until 1:00 or 2:00 p.m., when L.D. left with a DCS worker and Defendant came home with her. Defendant's mother stated that she was present on May 7 when Detective Wolff interviewed Defendant in the front yard of her house. She said that Detective Wolff did not advise Defendant of his *Miranda* rights until "after he questioned [Defendant]."

On cross-examination, Defendant's mother agreed that she was allowed to participate in Defendant's discussion with Detective Wolff on May 7. She agreed that Detective Wolff did not threaten Defendant during the conversation. She recalled that, on the morning of May 3, although there were several police cars in the driveway at the Lerchen Road residence, the cars' lights and sirens were not turned on. Defendant's mother reviewed the *Miranda* rights waiver form; she stated that the only handwriting on the document that belonged to Defendant was the signature. Upon reviewing Defendant's May 7 written statement, she testified that, in addition to signing his name, Defendant wrote the date and time on the document.

On rebuttal, Detective Wolff testified that, on May 7, Defendant first completed the *Miranda* rights waiver and then provided the written statement. Detective Wolff said that, on the *Miranda* rights waiver form, Defendant printed and signed his name and added the date and time of 12:50 p.m. to the document. Detective Wolff testified that Defendant also

signed the May 7 written statement and that Defendant filled in the date and time of 1:25 p.m. on the document.

Regarding the morning of May 3, Detective Wolff denied telling Defendant that he had to stay in a particular place inside the residence, restricting Defendant's movements in any way, or telling Defendant that Defendant could not speak to his parents. Detective Wolff stated, "To the contrary, I told [Defendant] he was free to do whatever he wanted." Detective Wolff further stated that he did not hear any of the other responding deputies place restrictions on Defendant.

At the conclusion of the motion to suppress hearing, the trial court reviewed the factors from *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), and found that Defendant was not subject to custodial interrogation when he made the statements to police on May 3 and May 7, 2012. Regarding the morning of May 3, the court noted that the officers testified Defendant was not restrained, was free to move about the premises, and indeed did move about the premises that morning. The trial court determined that the time and location of the questioning was "because of the circumstances" and "not something that was dictated by the police." It found that the duration of the questioning was not "substantial" or "long" and that the character of the questioning was not accusatorial. The trial court further found that neither the duration, character, or Detective Walker's tone or demeanor changed after receiving additional information from Detective Wolff at the hospital. The court found that Defendant had driven himself to the residence. It found that there were two uniformed deputies and two detectives at the residence that morning but that, "given the manner that these officers conducted themselves in during the time that they were on the premises[,] there's nothing in the record to find that the number of officers was oppressive or that their conduct while on the scene was oppressive." The court stated that, "the limitation of [Defendant's] movement . . . if any, was not significant enough to rise to the level . . . of being in custody." Additionally, the trial court found that the interactions between Defendant and law enforcement were "not oppressive" and that Defendant was not confronted with suspicions of guilt or evidence of guilt. Finally, the trial court noted that there was no testimony presented on the issue of whether Defendant was made aware that he was free to refrain from answering questions and end the May 3 interview.

Regarding the statements made on May 7, the trial court stated that "it would be a real stretch for anybody to say that the statement that was taken in Jefferson County . . . was the product of a custodial interrogation." Based on these considerations, the trial court denied the motion to suppress Defendant's statements to police.

*Motion to Exclude Photographs of the Victim*

Defendant also filed a pretrial motion to exclude photographs of the victim at trial. At a hearing on the motion, Dr. Steven Cogswell testified that he was a forensic pathologist and that he performed the victim's autopsy on May 4, 2012. Dr. Cogswell stated that he determined the cause of the victim's death was malnutrition and dehydration due to starvation. Dr. Cogswell stated that he had been a medical examiner since 1990 and that he had performed between five and ten thousand autopsies over the course of his career. He said that this was the only case in which he listed starvation as "the actual cause of death[.]"

Regarding the victim's physical condition, Dr. Cogswell stated that, although the victim was twenty-seven months' old at the time of death, the victim weighed only twelve pounds, which placed him "at the 50th percentile for a two month old as opposed to a two year old[.]" Moreover, the victim was only twenty-eight and a half inches tall, putting him "at 50th percentile for a ten month old[.]" Dr. Cogswell recalled that the victim was "very malnourished, essentially starved, as well as dehydrated and quite unkempt[.]" Dr. Cogswell stated that the victim had sunken eyes; visible cheekbones, ribs, and arm bones; very little muscle mass; and wasted buttocks cheeks. He explained that the victim had decubitus ulcer formation, or bedsores, as well as "flexion contractures on his left arm and leg," meaning that the victim had been "in a fixed position for a while." Internally, the victim's organs were "quite dry and the muscle was mostly wasted, but what muscle was there was dry and sticky which goes along with dehydration." Dr. Cogswell continued:

> The body cavities did not have their normal amount of fluid that helps lubricate their movement inside the torso. In addition, the GI tract had a little bit of food in the stomach and the first part of the small intestine and the rest of the small intestine was empty and it wasn't until we got to the colon that we start seeing some actual stool there and by the time we get to the end of the colon, that stool is essentially rock hard.
>
> . . .
>
> The dehydration was confirmed by the vitreous electrolyte studies that were done using the fluid from the eyes and the starvation was microscopically confirmed with various microscopic changes that go along with long-term starvation, which was really not any a surprise because, again, looking at the stature and the weight it's quite obvious that this had been going on for quite some time, a period of months as opposed to days or weeks.

Dr. Cogswell testified that he took about sixty photographs of the victim during autopsy. He reviewed the photographs and selected eighteen that he believed would help explain to the jury what killed the victim.[2] Dr. Cogswell explained that photograph number P1170108 (Trial Exhibit 64) showed the victim's fingernails, which were long and dirty, and he noted that the nail beds were cyanotic, "indicating poor oxygenation." He said that the photograph demonstrated the victim's dehydration and that the victim was generally "unkempt." Dr. Cogswell testified that photograph P1170109 (Trial Exhibit 65) depicted the top of the victim's head with ichthyosis, "essentially skin mixed with some skin oils and dirt to form [a] crust[,]" on the top of the victim's head. He said that the photograph illustrated the victim's dehydration and lack of care.

Dr. Cogswell stated that the next photograph, P1170118 (Trial Exhibit 66), showed the victim's left heel with a decubitus ulcer on it. He explained, "[Y]ou can see that these ulcers are beginning to form on the heel and just above the heel and these are classical decubitus ulcers that we see in folks who have not moved or been able to move for prolonged periods of time."

Dr. Cogswell identified photograph P1170122 (Trial Exhibit 67) as depicting the victim's buttocks and areas of severe diaper rash where "you can see the skin breakdown[.]" The photograph also showed areas of decubitus ulcers over the victim's spine and lower back. Dr. Cogswell testified that the next photograph, P1170134 (Trial Exhibit 68), showed severe wasting of the victim's right arm but that the victim's hand was larger, indicating edema under the skin in his hand. Dr. Cogswell said that the victim suffered from pulmonary edema and explained:

> He's got fluid in there because his heart is failing and he's not able to move that fluid around and resorb it. So even though he's dehydrated, he's actually got fluid in the soft tissue of his legs and his feet or his lower legs and his feet and to some degree in his hands because those are the farthest away from the heart.

Regarding photograph P1170102 (Trial Exhibit 71), Dr. Cogswell explained that it was the "standard initial photo showing basically the overall condition" of the victim at the

---

[2] The trial court ultimately ruled that eleven of the eighteen photographs were admissible; thus, we have limited our summary of Dr. Cogswell's pretrial hearing testimony to that which is relevant to those eleven photographs. The record on appeal does not contain the actual exhibits to Dr. Cogswell's testimony at the pretrial hearing. By failing to include the exhibits from the pretrial hearing, Defendant has risked waiver of this issue. *See State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). We note, however, that the State admitted eleven photographs at trial (Trial Exhibits 5-7, and 64-71), and we believe that we have been able to match the trial exhibits to the eleven photographs ruled admissible at the pretrial hearing based on Dr. Cogswell's description of those photographs.

time of death. Dr. Cogswell stated that photograph P1170112 (Trial Exhibit 70) showed the victim's right foot and said, "[Y]ou can see that ichthyosis, the skin around the foot, as well as the wrinkling of that skin and the length of the toenails." He explained that the next photograph, P1170114 (Trial Exhibit 69), was a photograph of the back of the victim's head and showed a loss of hair caused by "prolonged contact with a hard surface[.]"

Dr. Cogswell then identified a photograph of the victim that was not taken at autopsy but by Detective Wolff at the hospital. Regarding this photograph, numbered 2145 (Trial Exhibit 5), Dr. Cogswell testified:

> [T]his is a significantly better camera with better lighting . . . and better angle this photo actually shows to a greater degree or to a more clear degree the actual amount of wasting in the soft tissue and muscle of the face, as well as around the eyes. You can see that the corneas are starting even at this early stage to get a little bit cloudy and that, again, would go along with dehydration. But the lower lip you can see is starting -- just starting to get that darkening from the drying artifact that was more prominent in the autopsy photos, so this is actually more representative of what he looked like in life than the autopsy photo.

Dr. Cogswell stated that a second photograph taken by Detective Wolff, 2157 (Trial Exhibit 7), better depicted the depth of the ulcers, "particularly the lowest one . . . on the buttocks, as well as some of the fibrous tissue that is attempting to heal these ulcers[.]" Finally, Dr. Cogswell identified a third photograph from Detective Wolff, 2143 (Trial Exhibit 6), which showed the lower half of the victim's torso and upper part of the legs. Dr. Cogswell explained that it showed the victim had only "a very slight [green] discoloration" of his abdomen in life, in contrast to a previously discussed autopsy photograph depicting a postmortem change to the abdomen.

On cross-examination, Dr. Cogswell was asked whether his autopsy report sufficiently described what was depicted in the photographs of the victim. Dr. Cogswell responded:

> But what's in the photographs . . . is kind of outside the norm, so there's no real frame of reference for a jury to grasp what it is I'm trying to explain. I mean, I can say that there is ichthyosis or fish skin appearance or fish scale appearance, but unless you've seen it, that really doesn't relate. And I can say he's very skinny and looks like it's skin stretched over bones, and that may relate a little bit, but until you actually see that, the degree to which my words are going really doesn't register I don't think. That's something that we're not used to seeing.

. . .

I'm not sure I can adequately explain it, because again, even forensic pathologists who deal with death all the time and child abuse cases and dead children who have died natural or traumatic deaths, we don't see it very often and so if we don't see it very often and if . . . another forensic pathologist were describing this case to me, I would say let me see the photos because I would need to see it to understand what they're talking about. And if a forensic pathologist who is used to seeing this can't really relate to it, I think a jury would find it essentially impossible to relate to what we're actually seeing. So for that reason, I believe the photographs are critically important.

In ruling on the motion to exclude the photographs of the victim, the trial court excluded some photographs as cumulative, but the court determined that eleven photographs of the victim were admissible, finding that the prejudicial effect of the photographs did not outweigh their probative value and were "necessary for the State to build its case."

*Trial*

At trial, Dr. Debra Durst testified that she was working as an emergency room physician at Loudon County Medical Center on May 3, 2012, when the victim "was brought in without any signs of life and in horrific condition." She identified three photographs (Trial Exhibits 5-7) of the deceased victim and agreed that they depicted how the victim looked when he arrived at the hospital. Regarding the photograph of the victim's "back and back side[,]" Dr. Durst testified that it showed the victim's skin had begun to break down in places where he had no subcutaneous tissue.

Deputy B.J. Walker testified that, on May 3, 2012, he responded to a residence on Lerchen Road around 5:00 a.m. Deputy Walker recalled that, when he entered the residence, he noticed that the washing machine was running and that he then heard it shut off. He testified that he told the first detective to arrive on the scene about the washing machine.

Detective Brian Walker testified that he was the first detective to arrive at the Lerchen Road residence. He explained that, on his way to the scene, he spoke to Detective Wolff and learned that there was a deceased child at Loudon County Medical Center. Detective Wolff asked Detective Walker to speak to Defendant and secure the scene at the residence. When Detective Walker entered the residence, he spoke to Defendant, who was sitting on a couch in the living room. Detective Walker introduced himself, expressed his

condolences to Defendant, and asked if Defendant would speak to him about what happened. In the living room, Detective Walker saw a box containing a new grill sitting on the couch. He also noticed an odor in the residence that he could not place.

Detective Walker testified that he asked Defendant about the grill and Defendant said that his parents had recently purchased the grill for him and his wife. Defendant said that he had been at his parents' house most of the previous day but that he got home around 1:00 a.m. on May 3. He said that everyone was asleep when he arrived, so he began playing video games. Defendant told Detective Walker that, around 4:00 a.m., he realized that he had heard no noises from the victim's room. Defendant said that he "got a strange feeling that something was wrong[,]" so he went to check on the victim. He turned the light on in the victim's room and found the victim lying on his back with his eyes open but not breathing. He tried to wake the victim but got no response. Defendant said that he then woke up Mrs. Dotson and asked her if she had been feeding the victim. He said that he and Mrs. Dotson got into an argument and that he then put his older son, L.D., in the computer room and shut the door. Defendant told Detective Walker that about twenty to thirty minutes later, Mrs. Dotson took the victim to the hospital.

Detective Walker testified that he asked Defendant to give a written statement but that Defendant was "shaken up" and asked Detective Walker to write out his statement. Detective Walker wrote out the statement, and Defendant signed the document. Detective Walker then read Defendant's statement:

> I was at my parents' house all day working for my parents in Jefferson City. . . . I got home about one [a.m.] I was playing video games till around four [a.m. and] noticed that it was quiet in the boys' room. I went in to check on [the victim] and turned the light on and saw that he was not moving. He was just lying there with his eyes open. I checked for a pulse and tried to wake him up. I got no response. This was the first time I had [seen] him in about a month. I usually get home and everyone is in bed and I usually am up and gone before anyone gets up. I noticed about a month ago that [the victim] was losing weight, and [Mrs. Dotson] said that she would take care of it. To my knowledge, . . . she never took the baby to the doctor. I asked her how he was doing and she said that she was working on it. She told me she had been feeding him and he ha[d] been eating better. I saw that when I would get home that dishes and bottles were dirty so I thought they had been eating and drinking bottles.

> When I could not get [the victim] up, I came in and woke [Mrs. Dotson] up and [L.D.] who was six. When [Mrs. Dotson] woke up, I was freaking out. I asked if she had been feeding him and she said yes. We went

back and forth from our room to [the victim's] room. I took [L.D.] into the computer room and she took [the victim] to the hospital. I woke her up and she left the house with [the victim] in a short time. I'm not sure how long. It all does not seem real. It still does not seem like it is happening.

Detective Walker explained that Defendant gave consent for a search of the residence. During the search, Detective Walker took photographs of the residence. Detective Walker stated that there was a strong smell of urine in the children's bedroom that made his eyes water while he took photographs. He said that the "urine smell" would "almost knock you down as soon as you walk[ed] into the bedroom." He stated that there was a Pack 'n Play in the bedroom, as well as a small bed used by L.D. He said that the closet in the bedroom appeared as though everything on the floor had been "grabbed up and shoved" into the closet. The Pack 'n Play had an "adult-sized" bed sheet on it. When he removed the sheet, he found that the mattress was soaked through with urine. There was also a fresh bottle of milk in the Pack 'n Play that was still cold to the touch. When he asked Defendant about the bottle, Defendant said that Mrs. Dotson must have given it to the victim when she put him to bed the night before. Detective Walker said that the bottle was too cold to have been put out the night before, and Defendant admitted that, when he found the victim unresponsive, he took a bottle out of the refrigerator and tried to feed the victim. He said that he was afraid DCS would take L.D., so he left the bottle in the crib to make it look like the victim had been eating.

Detective Walker stated that he asked Defendant about why the washing machine had been running when the first deputy arrived on the scene. Defendant initially said that Mrs. Dotson must have been doing laundry, but then Defendant admitted that he turned on the washing machine after Mrs. Dotson left the residence with the victim. He said that he was attempting to clean up the residence before DCS arrived. Inside the washing machine, Detective Walker found a discolored bedsheet like the one on the Pack 'n Play mattress. He photographed the various items from the washing machine. Regarding the condition of some of the clothing in the machine, Detective Walker stated:

Several of the items of clothing still were stained to the point of I think it was a combination of they were so saturated with either urine, feces, some of them looked like they had vomit on it, but it was so saturated and the fact that there was so much compacted into the washer that it couldn't get clean.

. . . .

There was like a onesie for a small child, a onesie that was stained to the point that when I first took it out, I couldn't tell what was inside, what

- 16 -

was outside. The stain of feces of -- what appeared to be feces and urine, it was like a green onesie and made the inside/outside both brown.

Detective Walker said that he found a jar of baby food under the Pack 'n Play that had mold growing in it. He found two small jars of infant formula in the kitchen and "adult food" in the cabinets, refrigerator, and freezer. He said that there was a new microwave in the kitchen that still had cardboard inside it and had not been used. Detective Walker initially believed that there was no phone inside the residence, but Defendant said that he used a phone through the internet connection to call to his parents after finding the victim deceased.

Detective Walker recalled that, outside the residence, there was a small Dodge Dakota truck that "had a mound of garbage bags piled in the back of it." He said that there appeared to be fresh garbage bags on top of the pile. Detective Walker said that he did not know if the truck ran but that Defendant mentioned they only had one working vehicle, which Mrs. Dotson used to take the victim to the emergency room. He said that L.D. did not appear starved or emaciated.

DCS Investigator Amy Gray testified that she received a phone call from Loudon County authorities around 5:20 a.m. on May 3, 2012, advising her of the victim's death. Investigator Gray responded to the Loudon County Medical Center where she viewed the victim's body. She recalled that the victim had on a "brand new large baby diaper." She continued:

> He was wearing a pajama top that had Mickey Mouse on it. It was very, very dirty. You could see his bones on his face, his cheek bones. His eyes were kind of sunken down into his head, but they were open. He had very scaly hair, very, very rough textured hair, and you could see that some of the hair had fallen off onto the bed. They -- the nurse that was showing us the body then took his clothing and his diapers -- his diaper off for us. You could see all of his ribs. You could see the bones in his arms, but then there were places on his body that were kind of swollen, especially on his legs. He appeared to be bruised around his ribs. When they turned him over, he had sores down his back that were open and very irritated and . . . almost bloody looking.

Investigator Gray recalled that the victim's car seat was beside him. She explained:

> For one, it was an infant car seat. [The victim] was a little over two years old so normally a two year old doesn't fit an infant car seat. The car seat was very, very dirty. There were indentions where the body -- where

- 17 -

the [victim] had been in there it seemed a lot because of the amount of indention compared to a normal car seat.

Investigator Gray drove Mrs. Dotson back to the residence on Lerchen Road. During the drive, Mrs. Dotson said that she was "very scared" to see Defendant's family. When they arrived at the residence, law enforcement, Defendant, Defendant's mother, and Defendant's grandparents were there. Investigator Gray recalled that she walked through the residence and that, in the victim's bedroom, she noted that the mattress to the Pack 'n Play was "soaked with feces and urine." She saw a freshly-made baby bottle inside the Pack 'n Play and a jar of baby food under it that had mold growing in the jar. She said that the closet was "stacked" four or five feet high with clothing, toys, and other items. Inside the master bathroom, Investigator Gray saw "clippers and a very coarse . . . stack of hair sitting on the sink next to the clippers."

Investigator Gray explained that she drove L.D. to the DCS office in Kingston. She stated that she spoke to Defendant and Mrs. Dotson while there. Investigator Gray testified that Defendant acknowledged knowing that the victim was "in bad shape" but that Defendant said it was Mrs. Dotson's job to take care of the children. Investigator Gray testified:

> I explained to them that we had a lot of concerns about [L.D.]; that we had concerns about the state of [the victim] and that [the victim] had been unsupervised; that we had concerns that just based on my interviews I had done that day that [the victim] had been left alone, and that also based on other concerns, we were going to remove [L.D.] into foster care. [Defendant] got very upset, said this was not his fault, that it was [Mrs. Dotson's] job to take care of the children, not his.
>
> . . . .
>
> And I asked [Defendant], you know, what was your involvement? And he said that he was not there most of the time during the day, but that he did come home almost every night and he went to sleep and that he had seen [the victim] in the state that he was in that day and I said that's our concern, that's why we're removing [L.D.] into foster care.

On cross-examination, Investigator Gray testified that, when she first encountered Mrs. Dotson at the hospital, Mrs. Dotson repeatedly said that she was "sorry." Mrs. Dotson said that the victim had been sick and that she had taken the victim to the doctor in Jefferson City about two months prior. Mrs. Dotson said that she should have taken the victim back to the doctor. Investigator Gray recalled that she asked Mrs. Dotson if they could afford

food and that Mrs. Dotson responded, "Oh yes, we've got food stamps[.]" Mrs. Dotson said that they only had one working vehicle and that Defendant "wasn't home much" and that he had been looking for work. Mrs. Dotson admitted that the victim sometimes slept in the car seat. She claimed that, on the night of May 2, she gave the victim a sponge bath and cut his hair around 6:00 p.m. She said that she tried to play with him some but that he was tired, so she put him to bed around 9:00 p.m. Mrs. Dotson said that Defendant later woke her up around 4:00 a.m. and told her that the victim was dead. Investigator Gray testified:

> [Mrs. Dotson] initially had said that she just brought [the victim] straight to the hospital, but then on the second time when she told me she was going to quit lying about things, she told me that she administered CPR for about an hour, that they cleaned up the house, and then she took [the victim] to the emergency room.

Investigator Gray explained that Mrs. Dotson eventually told her that she did not take the victim to the doctor because "she didn't want someone to think he was being neglected and take him from her[.]" She said that, at one point, Mrs. Dotson said that she was "done lying and covering" for Defendant. She told Investigator Gray that Defendant made her tell his family that she took the victim to the doctor. Mrs. Dotson told her that the victim had been sick and that she had been sick too. She said that she was feeding the victim once a day and that "all he could keep down" was chocolate milk and formula. Mrs. Dotson said that the victim had choked on formula on the afternoon of May 2 but that she had given him CPR and he had been okay after that. The following exchange then occurred:

> Q. And on -- when you were outside talking with [Mrs. Dotson], you talked to her some more and at that point, she told you about [a] babysitter?
>
> A. Yes. She said again she was done lying and covering and then . . . it [was] brought to my attention that [Mrs. Dotson] and [Defendant] had been at [Mrs. Dotson's parents'] house about three weeks prior and spent the night and that's when I brought up about concerns about the child being left alone while she was at the hospital, about while they were at [Mrs. Dotson's parents' house], while they were visiting family, and that's how that came up [about a] babysitter.

Investigator Gray explained that Mrs. Dotson admitted that there was no babysitter. Mrs. Dotson said that she had no phone and was unable to call to make a doctor's appointment for the victim. Investigator Gray reiterated that Defendant admitted to her that he had seen the victim and had known that the victim was in bad shape and sick.

Defendant told her that he was home every night and that he knew the victim was sick. Mrs. Dotson agreed with Defendant's statement that he was home at night and that he knew of the victim's condition. Investigator Gray said that she sought "severe child abuse findings" against Defendant and Mrs. Dotson and that their parental rights were eventually terminated as to L.D.

On redirect examination, Investigator Gray said that Mrs. Dotson told her that Defendant "had made her lie to the family[.]" Mrs. Dotson said that Defendant told her to clean up the victim and help clean the house before she took the victim to the hospital. Defendant told her to make sure she changed the victim's diaper before taking him to the hospital. The following exchange then occurred:

> Q. [Investigator] Gray, in your conversations with [Mrs. Dotson], were you able to determine the length of time that [the victim] may have been left home by himself without anyone watching him?

> A. I know that it was overnight. I don't know the exact lengths. I know that there was a hospital visit that she was put into the hospital at Roane [County] Medical Center and I know that there was a trip to [Mrs. Dotson's parents' house] that [Defendant] and Mrs. Dotson both went, took [L.D.], and [the victim] was left overnight.

> Q. Can you put that into a timeframe in terms of anywhere from December of 2011 to his death on May 3rd of 2012?

> A. It's my understanding that the trip to [Mrs. Dotson's parents' house] was three weeks prior to his death and that [Mrs. Dotson's] hospital visit was right around that timeframe too.

RCSO Detective Arthur Wolff testified that he received a call on May 3, 2012, regarding the victim's death and that he responded to the Loudon County Medical Center emergency room. After speaking to medical staff, Detective Wolff viewed the victim's body. He said that the victim's eyes were "sunken" and that his skin was "very drawn and taut." He also observed sores on the victim's body. When asked about the victim's car seat, Detective Wolff stated:

> It appeared to be very dirty. [I] observed several very worn spots on it. One stood out particularly to me that was up at the top of it. I also observed . . . reddish brown stains, which based on observations was my belief that it was blood, the areas that I observed that were consistent with the larger, more serious sores that I saw on the [victim's] body.

- 20 -

Detective Wolff photographed the victim, the car seat, and the vehicle that Mrs. Dotson used to bring the victim to the hospital, after Mrs. Dotson gave consent for a search of the vehicle. He also photographed a Walmart bag that contained baby food in the passenger side floorboard of the vehicle.

Detective Wolff recalled that, after leaving the hospital, he then went to the residence on Lerchen Road. When he arrived, he spoke to Detective Walker and learned that Defendant had given consent to search the residence. Detective Walker took Detective Wolff through the residence, pointing out items of evidence. Detective Wolff assisted Detective Walker in taking photographs throughout the residence. Detective Wolff recalled that, in the victim's bedroom, he smelled "a strong odor" of urine and feces. He said that the victim's bedroom was directly adjacent to the computer room. In the computer room, Detective Wolff observed a computer, computer monitor, and a "bay station for a landline type telephone." Detective Wolff recalled that Defendant gave him a receipt from a Knoxville Walmart that was dated May 2, 2012, and that Defendant explained he stopped at Walmart to pick up baby food the previous night.

Detective Wolff testified that, on May 7, 2012, he went to Defendant's parents' home in Jefferson City to interview Defendant. Defendant agreed to talk to Detective Wolff and signed a *Miranda* rights waiver. Detective Wolff explained that he wrote out Defendant's statement as Defendant dictated it. Defendant told Detective Wolff:

> I lost my main job three to four years ago. I started working different jobs to make ends meet. I noticed in November/December that [the victim] was getting skinny. I would get home late and I would check in on the kids. About one and a half months ago, I noticed [the victim] was getting skinnier. I asked [Mrs. Dotson] if she was taking care of him and she said yes. After that I asked her if she was going to take him to a doctor and she said she would . . . and had been.

> I came home that night about one AM. I went in to play a game and after a while noticed there was no noise coming from [the victim's] room. I checked and [the victim] was not breathing. I got a bottle and tried to give it to him. I then went and woke her up. [L.D.] woke up so I took him into the computer room. After that, I heard the door slam.

> . . .

> I was trying to put the phone together to call 911. After [Mrs. Dotson] left, I started the washer and cleaned up a little because I was afraid of what DCS would do. I picked up a hair clipper, straightened the coffee table, called

- 21 -

mother several times and was trying to take care of [L.D.]  I then went and sat on the porch and tried to keep [L.D.] busy.  The cops showed up then.

Detective Wolff agreed that there was no 911 call placed from the Lerchen Road residence on the morning of May 3.

Dr. Richard Carter testified that he was an internal medicine doctor and pediatrician with a practice in Jefferson City.  He explained that he had been the victim's pediatrician.  Dr. Carter stated that the victim was born on January 20, 2010, and that he saw the victim for well-child visits on the following dates: February 2, 2010; March 16, 2010; May 18, 2010; August 26, 2010; December, 1, 2010; and February 8, 2011.

Dr. Carter testified that the victim was a "well[,] . . . normal newborn."  He stated that the last time he saw the victim was on February 8, 2011, when the victim was about twelve and a half months old.  At the time, the victim was a "well child" whose height and weight were within "normal parameters" for his age.  Dr. Carter explained that he saw the victim on December 1, 2010, for a "sick visit."  He said that the victim had RSV or sinusitis, for which Dr. Carter prescribed antibiotics and Benadryl.  Dr. Carter testified that the condition had resolved by the time of the victim's next trip to his office on February 8, 2011.

Amanda Dotson testified that she was Defendant's wife and the mother of the victim and L.D.  Mrs. Dotson explained that she had previously pled guilty to facilitation of felony murder and aggravated child neglect in connection with the victim's death.  She said that she had received an effective sentence of forty years in exchange for her guilty plea and that she had agreed to testify truthfully against Defendant as part of her plea agreement.

Mrs. Dotson testified that she met Defendant when she was sixteen and they worked together at a restaurant in Sevierville.  She said that they began dating when she turned seventeen and that she moved in with Defendant when she turned eighteen.  She stated that they were married in March 2005, when she was eighteen, and that she had their first child, L.D., in September 2005.  At that time, she, Defendant, and L.D. lived in a duplex in Jefferson City.  Mrs. Dotson worked at a restaurant, and Defendant hung drywall with his grandfather.  Mrs. Dotson testified that she became pregnant with the victim in 2009 and that she, Defendant, and L.D. moved to Kodak.  While there, she and Defendant worked at Dollywood and then, in the winter, she continued working at a restaurant in Sevierville.

Mrs. Dotson explained that, when L.D. was young, he had health problems.  She said that L.D. had "projectile vomiting" and that he "lost a lot of weight[.]"  She stated:

I had taken [L.D.] to the health department and they told me to take him to the hospital and they said that he had failure to thrive and acid reflux and basically just showed me what to do to get him healthy again. And we did all that.

. . .

I took him to therapy and he eventually -- he got better[.]

Mrs. Dotson recalled that they moved to the residence on Lerchen Road in the summer of 2011. She said:

[Defendant] wasn't working at the time. I wasn't doing very well either. You know, I was starting to get sick a lot and just couldn't work and so we just couldn't afford where we were living anymore. And so [Defendant's] parents offered to let us move to this property that they owned if we gave them three thousand dollars a year out of the tax return.

The following colloquy then occurred:

[THE STATE]: Now, you mentioned that you weren't doing too well at that point. What do you mean by that?

[MRS. DOTSON]: I was just having issues with pain. I was feeling sick a lot. And then not long after we moved there, we -- our doctor actually cut us off of our pain medication, so that -- I was also sick a lot from that I think.

[THE STATE]: Were you hospitalized at any point after you moved to Kingston?

[MRS. DOTSON]: Yes, ma'am.

[THE STATE]: What were you hospitalized for?

[MRS. DOTSON]: There was a lot of like pains in my stomach and in my chest and they found a really big ulcer one time and I'm not sure what else.

Mrs. Dotson recalled that she was hospitalized overnight on a couple of occasions. She said that, during this time, her mother and stepfather lived in Sevierville and that she

- 23 -

and Defendant did not have any family that lived nearby in Roane County. She said that, when she was in the hospital, the victim and L.D. stayed with Defendant. Regarding the victim's condition, Mrs. Dotson recalled that, around December 2011, "[the victim] was very sick too. He acted like he was in pain a lot. He was having trouble holding food down. He just didn't feel good." She said that she was home with the victim every day when she was not at the hospital and that she began noticing that he was losing weight a few months before his death. She testified:

> At first I tried to take care of it by myself. You know, I had been through it with [L.D.] so I was giving [the victim] different formula. I tried to introduce, you know, easier foods for him to eat. I gave him PediaSure and then he just kept getting worse.

Mrs. Dotson said that, when the victim's condition did not improve, she and Defendant talked about his condition and about taking him to the doctor. Mrs. Dotson testified that Defendant told her that the victim "was too bad for [her] to take him to a doctor" and that, if anyone saw how the victim looked, "they were going to take [the] kids away from [her.]" She said that Defendant told her she needed to "get [the victim] better." Mrs. Dotson recalled that she and Defendant had such conversations once or twice a week. She said that, in the months before the victim's death, Defendant lived at the residence on Lerchen Road with her and the children. She said that she was at home most days. The following exchange then occurred:

> [THE STATE]: Where was [Defendant]?
>
> [MRS. DOTSON]: He was either with us or going to get pain medicine from his family.

At a bench conference, defense counsel objected and requested a mistrial due to Mrs. Dotson's two references to pain medication. In a jury-out hearing, defense counsel acknowledged that he did not object to the first reference but explained, "I expect that [the prosecutors] mentioned and have instructed her more than once not to mention anything along those lines about pain medication. And this time she did it again blatantly and she's just disregarding the instructions she's received."

The prosecutor responded that she did not solicit or anticipate Mrs. Dotson's testimony and explained that Mrs. Dotson knew they would not be discussing pain medication. When the prosecutor suggested that the trial court admonish the witness and give a curative instruction to the jury, defense counsel responded that it was "up to the court to decide what to do about it" but asked the court to strike *all* of Mrs. Dotson's testimony if she did it again. Defense counsel also noted that a curative instruction could

bring more attention to Mrs. Dotson's testimony. The trial court asked defense counsel when he would want a curative instruction, and he responded, "I don't think we want it given now, Your Honor."

The trial court stated that it would strike Mrs. Dotson's references to pain medication and move forward unless defense counsel wanted an immediate curative instruction. Defense counsel stated, "[L]et's go forward with that admonishment and we'll talk about it later if we come up with a better idea." The trial court then admonished the witness that she was not to mention pain medication.

When the jury returned, Mrs. Dotson testified that they had one working vehicle that she and Defendant shared and that they had one cell phone that they shared. She said that they had a home phone that ran through the internet but that she did not know how to hook the phone up to use it. She said that Defendant was at home most nights and that he did not live anywhere else during the months leading up to the victim's death. She denied ever telling Defendant that the victim was getting better. She also denied telling Defendant that she took the victim to the doctor.

Regarding the night of May 2, 2012, Mrs. Dotson stated:

> We just kind of hung out around the house. I made the boys something to eat. [The victim] . . . acted like he didn't feel good. He wasn't hungry. We were just -- I would clean him as best I could with wet wipes, give him his bath. I mean, it was just a normal day and when I put him to bed that night, me and [L.D.], we watched Sponge Bob till we fell asleep.

She said that Defendant was not home that night. She recalled that Defendant woke her up the following morning, telling her that the victim was not breathing. Mrs. Dotson said that she performed CPR on the victim but could not get a response, so she took him to the hospital. She said that she did not call 911 from their residence because the home phone was not hooked up and the cell phone was "out of minutes." Mrs. Dotson testified that Defendant said he was going to stay with L.D. at the residence to clean it. She acknowledged that the residence was "a wreck."

Mrs. Dotson agreed that, about a month before the victim's death, she, Defendant, and L.D. visited her family in Sevierville a few times. She said that they stayed with her family overnight one time and that they left the victim alone at the residence on Lerchen Road. She acknowledged that she lied to investigators when she said that they had a babysitter for the victim.

- 25 -

Mrs. Dotson testified that Jonathan Morgan was her best friend at the time and that they worked together at the restaurant in Morristown. She denied being romantically involved with Mr. Morgan. She agreed that she sent Mr. Morgan messages over Facebook after the victim's death, asking him to contact her.

On cross-examination, Mrs. Dotson denied that she and Defendant argued often in the months leading up to the victim's death. She agreed that, when they lived in Jefferson City, she accused Defendant of having an affair but said that this was "years ago." She agreed that she lied to investigators when she told them that she took the victim to the doctor about a month before his death. Mrs. Dotson denied that Defendant was staying with his family in Jefferson City in the months before May 3, 2012. Mrs. Dotson stated, "[Defendant] knew [the victim] was sick. He was there with us."

Kevin Durham testified that he had been Mrs. Dotson's stepfather since she was about eleven years old. Mr. Durham recalled that, on December 10, 2011, Defendant and Mrs. Dotson stopped by his house with L.D. and the victim. He said that the victim was in a car seat in the back of Defendant's vehicle and that he was mostly covered by a blanket. Mr. Durham explained that he could see the victim's face through the car window and that the victim's face was "full" and the victim was smiling. Mr. Durham recalled that, in the middle of March 2012, he met Defendant, Mrs. Dotson, and L.D. at a gas station off of interstate exit 407, halfway between his house and their residence in Kingston. Mr. Durham stated that it was spring break and that he was picking up L.D. so that L.D. could spend the week in Sevierville with Mr. Durham and his wife. He said that Defendant and Mrs. Dotson were "dressed up" and told him that they were going to a chalet to celebrate their anniversary. Mr. Durham testified that the victim was not with them and that they told him the victim was with Defendant's parents. He stated that, towards the end of the week, Mrs. Dotson called him and asked if L.D. could stay a few more days because she had started a new job and had orientation. Mr. Durham and his wife agreed, and L.D. ended up staying with them until the first of April. Mr. Durham recalled that Defendant met him at the same gas station to pick up L.D. At that time, Defendant told Mr. Durham that his grandfather had been sick and that he had been checking on him a few times a week.

Mr. Durham recalled that, on April 10, 2012, Defendant, Mrs. Dotson, and L.D. came to his house in Sevierville. He asked them where the victim was, and they told him that the victim was "with a sitter." Defendant told Mr. Durham that the sitter was a friend of his from work. Mr. Durham said that Defendant, Mrs. Dotson, and L.D. ended up spending the night because Mrs. Dotson had a doctor's appointment the next day. Mr. Durham stated, "[Mrs. Dotson] was put in the hospital. She . . . had a doctor's appointment. They put her in the hospital. She was in the hospital three or four days." He recalled that, on April 15, he spoke to Mrs. Dotson and that she asked him to bring L.D. back to the gas

station off exit 407 so that Defendant could pick him up there. Mr. Durham testified that he did not see Defendant, Mrs. Dotson, and L.D. again before the victim's death.

Lindsay Key Graham testified that, in 2012, she lived next door to Defendant and Mrs. Dotson on Lerchen Road. Ms. Graham said that, in the spring of 2012, Defendant approached her one day when she was mowing her grass and asked her if she would be interested in babysitting for his kids. Ms. Graham testified, "And [Defendant] told me that he was receiving food stamps and I was more than welcome to eat the food in his house if I wanted to baby-sit and eat while I was down there, but I just didn't have time." She recalled that Defendant told her they received twelve hundred dollars in food stamps.

Keely Elledge testified that she was a registered nurse who worked at the Roane County Medical Center emergency room in 2012. Ms. Elledge identified a patient record from the emergency room for Mrs. Dotson that was prepared on April 11, 2012. She said that the record reflected that Mrs. Dotson was brought to the emergency room a little after midnight by her "husband." Ms. Elledge then identified a discharge summary for Mrs. Dotson dated April 14, 2012. She testified that a third document showed that Mrs. Dotson was seen at the emergency room again around 2:00 a.m. on May 2, 2012, and that Mrs. Dotson's "spouse" accompanied her to the hospital that morning.

Christopher Donald Key testified that he lived next door to Defendant and Mrs. Dotson on Lerchen Road in the spring of 2012. Mr. Key recalled that, on one occasion, Defendant came over and asked to borrow a lawn mower. He said that, during this timeframe, he saw Defendant driving up and down the driveway "[q]uite frequent[ly]."

Dr. Steven Cogswell testified that he was a forensic pathologist working as the Deputy Chief Medical Examiner in Knoxville when he performed the victim's autopsy on May 3, 2012. Regarding the victim's condition and his external and internal examination of the victim, Dr. Cogswell testified consistently with his prior testimony at the pretrial motion hearing. He stated that the victim's various conditions—such as the decubitus ulcers and flexion contractures on his left arm and leg—would have been painful but that, as wasted and malnourished as he was, the victim would have likely had a reduced degree of alertness. Dr. Cogswell stated that the victim's conditions existed while he was alive and that the victim would have experienced pain if someone touched on his back or backside while attempting to pick him up. He said that the victim's dehydration "[m]ost likely" affected the victim's eyesight, such that it was not as clear as it should have been, and also "[m]ost likely" affected his hearing. Dr. Cogswell testified that the flexion contractures would not have formed if the victim had been taken out of his crib or car seat a couple of times each day to move and stretch his limbs.

Dr. Cogswell noted that the victim's lungs were "very heavy for their size and microscopically both proved to have some pneumonia in them which is expected as an end stage for anyone undergoing a relatively slow dying process." He testified that the victim's cause of death was malnourishment and dehydration due to starvation, that the starvation was the result of neglect, and that the manner of death was homicide. Dr. Cogswell testified that genetic studies were performed on the victim to determine whether there was a natural cause for the victim's malnutrition. He explained, however, that the testing showed that the victim had no such genetic anomaly.

Dr. Cogswell stated that he sent the victim's body to an anthropologist, Dr. Murry K. Marks, to see if Dr. Marks could determine skeletally "when there was growth retardation and how long this growth retardation lasted." Regarding Dr. Marks' findings, Dr. Cogswell summarized:

> Based on [Dr. Marks'] evaluation of doing microscopic sections of bones and teeth, he determined that the timeframe cannot be specifically pinned down, but the physiologic age of [the victim] was about a year to a year and a half as opposed to his actual age, which was two. And that the normal what are called Harris lines, the normal indicators of an area or timeframe of sickness or starvation followed by recovery from that sickness or starvation where we'd have a dense area in the bone, those don't exist. And the reason they don't exist is because there was never any recovery. So the timeframe from the beginning of his starvation to his death was not broken by any significant period of recovery.

The following exchange then occurred:

> Q. Within a reasonable degree of medical certainty, can you estimate the time frame during which [the victim] was deprived of nutrition?
>
> A. Well, based on the findings of the flexion contractures and the dehydration and the muscle wasting, etcetera, we're looking at a period of months. Probably at least a couple of months, could be as long as six months or longer. A lot depends on whether it's complete starvation or starvation interrupted by a small amount of food because obviously those are two different things. Ultimately, it's the same downhill course, but you can get little plateaus along the way.
>
> In this case, we do have some evidence that there was some feeding because I did find some material in the GI tract, so this is not complete total starvation where there's no food being given at all.

Dr. Cogswell testified that he could not tell how often the victim was fed. However, he concluded, based on the fact that wasting takes time and that an individual on a starvation diet for a week or two will not lose all of his buttocks muscles, that

> we've got to have a prolonged period of time of either no food or very little food, just enough to keep you alive, which is—the studies that were done during the World War II timeframe about concentration camp inmates, they actually got some volunteers to be starved and they found that with a little bit of food, just barely enough to keep them alive, they would end up with this wasting process where the muscle mass would just go away. There would be no fat.

Dr. Cogswell testified that the victim's starvation would not have been obvious at the beginning but would have accelerated toward the end and become ever more apparent. He stated that the victim's sunken eyes and wasted facial muscles would have been readily apparent even when the victim was clothed. Dr. Cogswell testified that the victim would have had a chance of survival if he had been taken to the hospital around April 11, 2012, but Dr. Cogswell could not say whether the victim would have actually survived. Dr. Cogswell explained that, even if the victim had been taken to the hospital, the victim would still have been extremely sick. He said that the victim would still suffer from the flexion contractures and muscle wasting and would still have been stunted and extremely thin. Dr. Cogswell insisted that the victim would not have looked like a normal two-year-old child a month before his death. Dr. Cogswell then identified a series of photographs taken before and during autopsy and testified as to how the photographs supported and illustrated his autopsy findings.

On cross-examination, Dr. Cogswell stated that the victim's pneumonia was "acute" and that the victim had the condition for, at most, a few days prior to his death. He denied that pneumonia was the cause of the victim's death and stated that the pneumonia was a result of his dehydration, explaining that "dehydration tends to speed the development of pneumonia."

At the close of the State's proof, defense counsel renewed the motion for mistrial, asserting that Mrs. Dotson's testimony violated an agreement between the defense and the State not to introduce Defendant's pain clinic records or discuss Defendant's use of pain pills. The trial court noted that the terms of the agreement were never announced, stating that there was a "gentleman person's agreement that the drug use issue would not come up was all I recall." The State responded that it agreed not to mention opioids or argue that the victim's death was caused by opiate abuse but stated that it preserved its ability to use, if necessary, medical records to show that Defendant was in the vicinity and acting on Mrs.

Dotson's behalf at a time when he claimed he was not. The State asserted that Mrs. Dotson had been instructed not to go into "those substances" and that she did so on her own.

Regarding Mrs. Dotson's first reference to pain medication in which she stated that their "doctor actually cut us off of our pain medication," the State noted that she offered the testimony in response to a question about her health when she moved to Kingston. The State explained that Mrs. Dotson's medical records referred to a variety of debilitating and painful conditions and that it asked about her health to determine whether these conditions prevented her from caring for herself and her children. The State argued that it did not prompt Mrs. Dotson to testify about being cut off from pain medication and that her testimony was not responsive to its question. As to Mrs. Dotson's testimony that Defendant was going to his family's house to get pain medication, the State asserted that its question "was where was [D]efendant while you were at home? Not why was he gone; where was he?" The State averred that Mrs. Dotson took it upon herself to offer that testimony.

The trial court asked about Defendant's preferred remedy, and defense counsel suggested that the court give a curative instruction during the jury instructions that directed the jury to disregard "comments from any witnesses about going to [Defendant's] parents' house to get drugs."

In ruling on the motion for mistrial, the trial court addressed Mrs. Dotson's first reference to pain medication in which Mrs. Dotson asserted that they were cut off from their pain medicine, noting that pain medicine comes in various forms, that she did not say the medication was an opiate, and that it was evident from her statement that the pain medication was legal and prescribed. The court concluded that, although Mrs. Dotson's testimony violated the parties' agreement, the State prepared her and instructed her not to discuss pain medication, did not craft its questions to elicit any response in respect to the drug use, and did not intentionally attempt to breach the agreement.

Regarding Mrs. Dotson's statement asserting that Defendant was "either with us or gone to get pain medicine from his family," the trial court found that the statement was not solicited by the State. The trial court refused to declare a mistrial, stating that it would address the curative instruction at the jury charge conference. Ultimately, defense counsel requested that the court not give a curative instruction because the defense did not want to call additional attention to this part of Mrs. Dotson's testimony.

Defendant testified that Mrs. Dotson became pregnant with L.D. in 2005 and that they got married. He recalled that, when L.D. was two or three years old, he and Mrs. Dotson "started not getting along as well." They began arguing often, and then Defendant contacted an ex-girlfriend online. Defendant said that Mrs. Dotson discovered his

messages to the ex-girlfriend and that this was a source of a lot of the conflict between him and Mrs. Dotson.

Defendant recalled that, when the victim was born, he was a healthy baby. He stated that, after the victim's birth, both he and Mrs. Dotson were working and sharing the responsibility for caring for their children. He said that he worked hanging drywall and that Mrs. Dotson worked as a server in various restaurants. Defendant stated that, in August 2011, they moved to the residence on Lerchen Road. He said:

> Well, we were having financial problems at the time. I wasn't able to, you know, keep up with the money and for the rent and electricity and everything like that, and my parents had just got a house on Lerchen that they rented out and they said that we could live there.

Defendant testified that, in December 2011, he and Mrs. Dotson began arguing about their plans for Christmas; he wanted to go to his parents' house while she wanted to visit her parents. Defendant said that he ended up taking L.D. to his parents' house for Christmas and that Mrs. Dotson took the victim to see her parents. He recalled that Mrs. Dotson and the victim joined his family the next day at a hotel in the Gatlinburg area. Defendant said that his mother angered Mrs. Dotson by comments she made to Mrs. Dotson about how to care for the children. Defendant testified:

> [T]hat led to a big fight. And I said, well, I really -- I just need a break right now. This was around the time that my grandfather had gotten sick and had a stroke as well. He could barely walk. And I said, I'm just going to stay with my parents for a little bit, you know. I'll be back to the house so often, every so often, and I'm going to take care of my parents. I think we need a break for a little while.

Defendant testified that, for the next month or two, he continued to visit the Lerchen Road residence often. He said that he would spend the day and night there two or three days a week and that this lasted until the end of February. Defendant explained that, when he was at the residence, he saw the children and interacted with them. However, he said that every time he visited the residence, he and Mrs. Dotson argued. Defendant recalled that he and Mrs. Dotson "had a massive fight" at the end of February because he was "not there as often[.]" Defendant testified that he told Mrs. Dotson they needed to "take an extended break" and that he decided to "move[] out completely at that point." Defendant continued:

> I remember not long after that, I think it was a few days, [Mrs. Dotson] called me, said that she needed some money and I told her at that time that I

- 31 -

didn't have any money . . . to bring down. And I told her perhaps you should call your parents and see if you could get some money and she -- which she did. And she called me back and said that she had, but she couldn't get all the way up there. She only had enough gas to get around town at the time. So I went down there, picked her up, took her up to her parents and she went in and got the money and then came out. And I remember that specifically because I remember reaching back to play with [L.D.] and looking at [the victim] and I noticed he was slightly skinnier than I remembered him in December and I asked [Mrs. Dotson] about it. I said, you know, is he okay? What's going on? And she said, [o]h, he's been a little bit sick but he's seen the doctor.

Defendant said that, when he moved in with his mother and grandparents, Mrs. Dotson had access to two vehicles, a Pontiac Sunfire and the Dodge Dakota truck. He said that, after moving out, he rarely saw Mrs. Dotson or his children. Defendant stated that he last saw the children in early March when he took them and Mrs. Dotson to visit Mrs. Dotson's parents.

Defendant said that Mrs. Dotson called him in early April and asked for some money. When Defendant and his uncle went to the Lerchen Road residence, Mrs. Dotson was not there, so Defendant left the money in a well house on the property. Defendant recalled that, at the end of April, he went to the property to mow the lawn and drop off a new microwave and grill. Defendant said that he talked to the neighbor that day about borrowing a lawn mower. He continued, "There's another time that [Mrs. Dotson] had called me, told me that she got admitted in the hospital, that it was deadly and then she was in Roane County, so of course, I was worried." Defendant said that he went to the hospital to see Mrs. Dotson and that she told him she had a "bad ulcer and that it had been life-threatening." Defendant asked Mrs. Dotson about the children, and she told him that they were with her parents. According to Defendant, Mrs. Dotson said that she was going to spend time at her parents' home after getting out of the hospital. Defendant stated that he only visited Mrs. Dotson in the hospital one time. He denied ever taking her to the hospital or picking her up from the hospital in the months leading up to the victim's death.

Defendant testified that Mrs. Dotson called him on the night of May 2 and said that the victim needed food and she needed "some drinks," so he went to Walmart and picked up those items for her. He said that he drove to the residence on Lerchen Road, arriving around 1:00 a.m. on May 3. Defendant stated that nothing seemed out of the ordinary inside the residence, and he denied smelling a foul odor in the victim's bedroom. He stated that everyone in the house was asleep, so he went in the computer room and played video games until about 4:00 a.m. He testified, "I noticed there wasn't really any sound coming from the kids' room, so I went in and checked on [the victim]." Defendant said that was

when he found the victim deceased. Defendant acknowledged that, after Mrs. Dotson took the victim to the hospital on the morning of May 3, 2012, he cleaned up the house and turned on the washing machine. He explained that he was "in a panic" and that he did not want DCS to take L.D. away from them.

Defendant said that he was "out of [his] mind" when he gave his statement to Detective Walker. He recalled that, after speaking to Detective Walker, he and L.D. were taken to the DCS office. Regarding his conversation with DCS employees, Defendant stated, "They just kept telling me that there's no way I could have not known this; there is no way that I didn't know that he was in this condition. And I was so upset that I -- they just kept repeating it." The following exchange then occurred:

> Q. Did . . . you tell them that you stayed there every night?
>
> A. That I stayed there every night? I believe it was mentioned, yes.
>
> Q. But did you say that?
>
> A. I think [Mrs. Dotson] said it.
>
> Q. What did you say when that came out?
>
> A. I didn't say anything.

Defendant recalled that, a few days after the victim's death, he gave a statement to Detective Wolff. He stated that, although he told Detective Wolff that he noticed the victim getting skinnier in November or December, "[i]t was more like March when I actually noticed him getting skinnier." He explained that he was upset when he spoke to Detective Wolff. Defendant explained that, after he moved out of the Lerchen Road residence, he took Mrs. Dotson money and food "[a]ny time she called and said she needed something[.]" Defendant denied knowing that there was anything wrong with the victim prior to his death and stated that he would have taken the victim to the hospital had he known.

On cross-examination, Defendant said that, when the victim was born, he fed and bathed him and changed the victim's diapers. He stated that he stopped doing these things for the victim "right around the time that [he and Mrs. Dotson] started having a lot of arguments and [he] wasn't a home as much." The following colloquy occurred:

> Q. Are you saying that when you started fighting with [Mrs. Dotson], you quit changing diapers on [the victim]?

A. No, I was still going down in January and February and going down there periodically and still taking care of the kids when I was there.

Q. Were you changing diapers in January/February?

A. Yes.

Q. Feeding the kids?

A. Yes.

Q. Bathing the kids?

A. Yes.

Q. You were making sure [the victim] got enough nutrition, right?

A. Yes.

Q. Why did that stop?

A. We had a really big fight at the end of February and then I told her I needed a lot more time.

Q. Did that mean time away from your kids too?

A. Not necessarily. I wanted to see my kids.

Q. But you didn't?

A. No. I saw them in early March. I was worried I was going to lose them.

Q. If you were worried you were going to lose them, why would you stop seeing them?

A. I was told by a friend that the courts would favor the wife in these cases and if I tried to take the kids home with me, that the court would give [them] to her[.]

When asked why he told detectives that he noticed the victim losing weight in November or December, Defendant responded, "I was thinking about the fights that we were having, me and [Mrs. Dotson]." Defendant denied being at Mr. Durham's house with Mrs. Dotson and L.D. on April 10, 2012. He also denied bringing L.D. to Mr. Durham in the middle of March and denied ever meeting Mr. Durham at the gas station off exit 407. Defendant stated that Mr. Durham was lying when he claimed otherwise.

Defendant denied taking Mrs. Dotson home from the hospital in April 2012. He agreed, however, that his signature was on the discharge paperwork from the hospital following a line that read: "I hereby designate the following person to be responsible for my well-being upon discharge." Defendant agreed that he told detectives that two of his friends from work had been babysitters for the victim, but he claimed that this statement was based on what Mrs. Dotson had told him, not his personal knowledge. Defendant said that he could not recall whether the soiled pajamas found in the washing machine were on the victim when he found the victim deceased in the Pack 'n Play. Defendant agreed that he immediately blamed Mrs. Dotson for the victim's death but acknowledged that he did not call 911 and report his son's death or Mrs. Dotson's involvement in it.

Susette Dotson, Defendant's grandmother, testified that, in 2012, she lived in Jefferson City with Defendant's grandfather, mother, and uncle. She recalled that Defendant began staying at the house in January of that year after Defendant "left his wife[.]" She explained that Defendant helped care for her and Defendant's grandfather, who was very sick and in the hospital in February 2012. She testified that Defendant was a "very caring father" and that she observed Defendant taking care of his children.

Defendant's uncle, Danny Dotson, testified that he lived with Defendant's mother and grandparents in Jefferson City in 2012. He recalled that Defendant began coming to the house in February 2012, after Defendant "had a big falling out" with Mrs. Dotson. Defendant's uncle said that he saw Defendant at the house "[p]retty much all the time" after the end of February. He testified:

> I would go down there most nights, talk to him before I left [for work] and when I pull in in the morning, I would come -- from where I was pulling in, you could see [Defendant's] car when he was down there, so yeah, and a lot of times I'd go down there and talk to him when I got home. I know he was there.

Regarding the Dodge Dakota truck found at the Lerchen Road residence, Defendant's uncle stated that the truck ran and was a reliable vehicle. He explained that he left the truck at the residence for Mrs. Dotson to use in late October or early November 2011, after her Pontiac Sunfire needed some repairs. He recalled that he was at the Lerchen

Road residence about a month before the victim's death; he said that he went with Defendant to drop off some money for Mrs. Dotson. He explained that neither Mrs. Dotson nor the Dodge Dakota truck were at the residence that day. He said that, about a week before the victim's death, he accompanied Defendant to the residence to mow the lawn and deliver a grill and microwave. Once again, neither Mrs. Dotson nor the Dodge Dakota truck were at the residence. He testified that Defendant went inside the residence for five or six minutes on that occasion.

Billy Kyker testified that he worked on Mrs. Dotson's Pontiac Sunfire in November 2011, when it needed a new fuel pump. He said that the car ran well after he worked on it. He further said that the car had "a lot of trash" in it and that, when Defendant and Mrs. Dotson picked up the car, he told Mrs. Dotson that she needed to clean out the car.

Lionel Breton testified that he was a friend of Defendant's and Defendant's family. Mr. Breton stated that he ran a paint and body shop and that he worked on the Dodge Dakota truck for the Dotson family. He said that the truck ran well and that it was a dependable vehicle. Mr. Breton stated that he went with Defendant to the Lerchen Road residence at the beginning of March 2012, to help Defendant cut up a tree that had fallen over the driveway. He said that neither Mrs. Dotson nor the Dodge Dakota truck were at the residence that day.

At the close of proof, the State announced that it would enter a nolle prosequi as to the charge of first degree premeditated murder. Following deliberations, the jury found Defendant guilty of first degree felony murder in Counts 2 and 3, aggravated child abuse in Count 4, and aggravated child neglect in Count 5.

*Sentencing Phase of Trial*

Following a bifurcated hearing, the jury found that the State had proven beyond a reasonable doubt the following aggravating circumstances: that the murder was committed against a person less than twelve years old and Defendant was eighteen years old or older; that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and that the murder was knowingly committed, solicited, directed, and/or aided by Defendant while Defendant had a substantial role in committing aggravated child abuse and aggravated child neglect. The jury further determined that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances. The jury sentenced Defendant to life without the possibility of parole for first degree felony murder in Counts 2 and 3. The trial court merged the conviction for aggravated child abuse in Count 4 into Count 2 and the conviction for aggravated child neglect in Count 5 into Count 3. The court did not impose a sentence in Counts 4 and 5.

Defendant filed a timely motion for new trial, which was denied in a written order following a hearing. This timely appeal follows.

## II. Analysis

### A. Motion to Suppress Defendant's Statement

Defendant asserts that the trial court erred when it denied the motion to suppress his statement given to police on the morning of May 3, 2012. He argues that he was subject to custodial interrogation without the benefit of *Miranda* warnings prior to questioning. The State responds that the record does not preponderate against the trial court's conclusion that Defendant was not subject to custodial interrogation and that, therefore, the detectives were not required to provide *Miranda* warnings.

On appeal from a trial court's ruling on a motion to suppress, the trial court's findings of fact should be upheld unless the evidence preponderates to the contrary. *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* This court may consider the entire record, including the evidence submitted at the suppression hearing and at trial, in evaluating the correctness of the trial court's ruling. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *State v. Daniel*, 12 S.W. 2d 18, 23 (Tenn. 1996)).

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444, 473.

Our supreme court has stated that the test to determine whether a defendant was in custody is "whether, under the totality of the circumstances, a reasonable person in the

suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court set out the following non-exclusive factors to assist in this determination:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id*. The United States Supreme Court has recognized that "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

Here, the record supports the trial court's conclusion that Defendant was not subject to custodial interrogation when he was questioned on the morning of May 3, 2012.[3] Detective Walker interviewed Defendant around 7:00 a.m., while Detective Wolff interviewed him sometime later that morning. The questioning occurred in the living room of Defendant's home. Defendant drove himself to the residence earlier that morning, and he was already in the living room when Detective Walker arrived on the scene. Before questioning, Detective Walker asked Defendant if he would speak to him, and Defendant agreed. The duration of the questioning was not long, and the character of the questioning was not accusatorial. Both detectives essentially asked Defendant "what was going on." Although two or three other deputies were at the scene that morning, they were primarily outside the residence and did not question Defendant. Additionally, Defendant was not restrained; he was free to move about the premises, and indeed did move about the premises that morning. In its findings, the trial court accredited the testimony of Detective Walker, who stated that he never told Defendant that Defendant could not go outside or leave the residence. Detective Walker also denied telling Defendant that he had to stay at the residence to speak to the DCS worker. Detective Walker stated that Defendant went

---

[3] On appeal, Defendant does not challenge the trial court's ruling on the motion to suppress as it relates to Defendant's statements on May 7.

outside several times to smoke and to check on L.D.  Likewise, Deputy Walker testified that he saw Defendant "going in and out" from the living room to the porch several times.

We agree with the trial court that, under the totality of the circumstances, a reasonable person in Defendant's position would not consider himself deprived of freedom of movement to a degree associated with a formal arrest.  *See Anderson*, 937 S.W.2d at 855.  Accordingly, law enforcement officers were not required to provide *Miranda* warnings on the morning of May 3, and Defendant is not entitled to relief on this claim.

### B. Mrs. Dotson's Testimony About Pain Medication

Defendant contends that the trial court erred in failing to grant his motion for mistrial following Mrs. Dotson's testimony about drug use—a subject that the parties had previously agreed would be excluded.  Defendant also raises a claim of prosecutorial misconduct, asserting that the prosecutor purposefully elicited the testimony from Mrs. Dotson and that, "[g]iven the controversial nature of drug use in this country, and particularly pain medications in this area, the testimony regarding [D]efendant's drug use could have had a severe and negative impact on the minds of the jury."

The State responds that the trial court properly refused to declare a mistrial based on Mrs. Dotson's unsolicited testimony.  The State argues that Defendant failed to show a manifest necessity for a mistrial and notes that Defendant declined any curative instruction. Finally, the State contends that Defendant's reliance on case law governing allegations of prosecutorial misconduct is misplaced because "the question before . . . this Court, [is] not whether the prosecutor committed improper prosecutorial argument, but whether a mistrial was necessary because [Mrs.] Dotson presented inappropriate testimony to the jury."

### 1. Denial of Motion for Mistrial

A mistrial is appropriate "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).  The decision of whether to grant a mistrial is within the sound discretion of the trial court.  *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  Normally, a mistrial should be declared only in the event that a manifest necessity requires such action.  *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did."  *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  The burden to show the necessity for a mistrial falls upon the party seeking the mistrial.  *Id.*  This court will not disturb the trial court's decision unless there is an abuse of discretion.  *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion, we may consider: "(1) whether

the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

In this case, the record reflects that Defendant filed a pretrial motion asking the trial court to exclude medical records pertaining to his use of pain medication. The parties reached an agreement whereby the State announced it would not introduce evidence related to Defendant's misuse of pain medication in its case-in-chief. In her testimony, Mrs. Dotson made two references to pain medicine, which were improper under the agreement. However, we do not agree that the comments created a "manifest necessity" for a mistrial. First, there is no indication that the State deliberately elicited the comments to create an inference of Defendant's guilt. *See Honeycutt v. State*, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976). Rather, Mrs. Dotson's comments were unresponsive and unsolicited. As found by the trial court, Mrs. Dotson volunteered the testimony on both occasions despite the State's instruction to avoid the topic of pain medication. When Mrs. Dotson testified that she and Defendant were cut off from their pain medication by their doctor, she did so after the State asked her to explain her prior testimony that she was not "doing too well" when she moved to Roane County. The State was attempting to elicit testimony about Mrs. Dotson's numerous physical ailments, not testimony about Defendant's use of pain medication. When Mrs. Dotson stated that Defendant got pain medication from his family, she did so after the State asked where Defendant was when she was home with the children. The State's questions were not designed to elicit testimony about Defendant's use of pain medication.

Additionally, although the trial court gave no curative instruction regarding Mrs. Dotson's comments, we note that Defendant specifically requested that no such instruction be given. Finally, the State proof against Defendant was strong. *See Welcome*, 280 S.W.3d at 222. Dr. Cogswell testified about the victim's starvation and the prolonged nature of the starvation, and Detective Walker testified about the condition of the Pack 'n Play, the soiled laundry, and strong odor of urine and feces in the victim's bedroom. Moreover, Defendant made statements to detectives and to DCS indicating that he lived in the Lerchen Road residence, that he knew the victim had lost weight, and that he saw the victim's condition. Defendant also admitted that he altered the scene by putting the fresh bottle of milk in the Pack 'n Play and by attempting to wash the victim's soiled bedding and clothes. Mrs. Dotson testified that Defendant lived in the residence with her and the children and that Defendant repeatedly told her not to take the victim to the doctor when she expressed concern about his condition. The State presented considerable evidence against Defendant, and we believe that the evidence would have compelled the jury to convict Defendant despite the improper comments. Accordingly, the trial court acted within its discretion when it concluded that Mrs. Dotson's comments did not create a manifest necessity for a mistrial. Defendant is not entitled to relief based on this claim.

## 2. Prosecutorial Misconduct

Regarding Defendant's claim of prosecutorial misconduct, we note that Defendant failed to raise the issue in his motion for new trial and, instead, raised the claim for the first time on appeal. By failing to raise the issue in a timely motion for new trial, Defendant has waived our consideration of the claim. *State v. Allen*, 593 S.W.3d 145, 54 (Tenn. 2020) (stating that "[g]enerally, issues raised for the first time on appeal are waived."). Moreover, Defendant has not met his burden of establishing the need for plain error review. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (stating that the defendant bears the burden of persuading the appellate court that the trial court committed plain error). Defendant is not entitled to relief on this claim.

## C. Admission of Photographs

Defendant next contends that the trial court abused its discretion when it allowed the admission of "shocking" and "gruesome" photographs of the deceased victim, Trial Exhibits 5-7 and 64-71. Defendant argues that Dr. Cogswell provided detailed testimony about the cause of the victim's death and that he gave thorough explanations of the numerous ailments and injuries to the victim. He argues that the photographs were unnecessary and "did nothing but inflame the jury against [him]." The State responds that the trial court acted within its broad discretion by admitting the autopsy photographs of the victim.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005). "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* at 949. We "need not find that the trial court made the best decision or the one the appellate court would have made" but instead must determine "whether the trial court's decision was within the range of acceptable alternatives." *State v. Willis*, 496 S.W.3d 653, 729 (Tenn. 2016).

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *Collins*, 986 S.W.2d at 20. Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Banks*, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *Collins*, 986 S.W.2d at 21 (citing *State v. Duncan*, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks*, 564 S.W.2d at 951. If the defendant offers to stipulate to the facts shown in the photograph or the defendant does not dispute the testimony that the photographs illustrate, the prejudicial effect is more likely to substantially outweigh the photographs' probative value. *Id.*

Turning to the instant case, the trial court admitted eleven photographs of the victim, three of which were taken by Detective Wolff at the hospital and eight of which were taken by Dr. Cogswell at autopsy. All of the photographs were of the outside of the victim's body; no internal autopsy photographs were admitted. The photographs accurately depicted various areas of the victim's body and showed the victim's dirty and untrimmed nails, dry skin, ichthyosis, decubitus ulcers, severe diaper rash resulting in the breakdown of skin, edema in the hands and feet, severe muscle wasting, flexion contractures, and alopecia. After a lengthy hearing on the matter, the trial court found that the photographs were necessary for the State to build its case against Defendant and that Dr. Cogswell's testimony alone was insufficient.

Upon review, the photographs were certainly relevant in that they tended to show that the victim was knowingly abused and neglected. *See* Tenn. Code Ann. § 39-15-401 (2012). They demonstrated the deleterious effect of prolonged starvation upon the victim's body and health and that the victim suffered serious bodily injury. Moreover, the photographs were highly probative because of the inadequacy of testimonial evidence in relating the facts to the jury. Dr. Cogswell testified at the pretrial hearing that his testimony was inadequate to relate the facts of the victim's condition to the jury. Dr. Cogswell testified that the photographs were "critically important," that words failed to accurately portray the victim's condition, and that the jury would have no frame of reference for his explanations. Additionally, the photographs were highly probative in that they rebutted Defendant's contention that he did not know about the severity of the victim's condition and the victim's need for immediate medical attention. Based on its verdict, the jury accredited testimony from Mrs. Dotson and Mr. Durham, as well as statements made by Defendant to investigators, that indicated Defendant was with the victim in the months leading up to his death. The photographs reflect what Defendant would have seen when interacting with the victim, i.e., the victim's obvious need for sustenance and medical assistance. Finally, although the photographs are difficult to view, they are not unfairly prejudicial. We agree with the State that the contested photographs "were gruesome or horrific because the abuse and neglect that the victim sustained was horrific and, as Dr. Cogswell testified, "beyond description." "[F]airly tak[ing] into account the grotesque and horrifying nature of the conduct charged," we cannot conclude that the trial court's decision to admit the photographs "was outside the range of acceptable alternatives." *Willis*, 496 S.W.3d at 729.

Defendant has failed to show that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice, and therefore, the trial court did not abuse its discretion in the admission of the photographs. Defendant is not entitled to relief.

### D. *Sufficiency of the Evidence*

Defendant asserts that the evidence was insufficient to support his convictions because he was not living in the Lerchen Road residence in the months when the victim deteriorated and died and because his testimony was "detailed, thorough, and more credible than [Mrs. Dotson's] testimony." The State responds that the proof at trial is sufficient to sustain Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R.

App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). A defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse [or] aggravated child neglect[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2012). A conviction for felony murder requires no culpable mental state "except the intent to commit the enumerated offenses or acts." Tenn. Code Ann. § 39-13-202(b) (2012). The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the victim's death, and whether such intent existed is a question of fact to be decided by the jury. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108.

A person commits aggravated child abuse when he commits child abuse and "[t]he act of abuse . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1) (2012). A person commits child abuse when he "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" Tenn. Code Ann. § 39-15-401(a) (2012). Aggravated child abuse is a nature-of-conduct offense. *Dorantes*, 331 S.W.3d at 386.

An individual commits aggravated child neglect when he commits child neglect and the act of neglect results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1) (2012). A person commits child neglect when he "knowingly . . . neglects a child . . . so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b) (2012). The State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare. *State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001). Tennessee Code Annotated section 39-15-401(g) specifies that

- 44 -

"'adversely affect the child's health and welfare' may include, but not be limited to, the natural effects of starvation or dehydration." Tenn. Code Ann. § 39-15-401(g) (2012).

Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (2012). Serious bodily injury is defined as bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or a broken bone of a child who is eight years of age or less. Tenn. Code Ann. § 39-11-106(a)(34) (2012).

Additionally, we note that the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person can be held criminally responsible for the conduct of another if "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2012). The evidence at trial "must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386.

## 1. Aggravated Child Abuse

When viewed in the light most favorable to the State, the evidence established that Defendant knowingly treated the two-year-old victim in such a manner as to inflict serious bodily injury. The testimony showed that Defendant, in conjunction with Mrs. Dotson, deprived the victim of nourishment over the course of many months causing the victim to suffer substantial impairment of a function of a bodily member, organ, or mental faculty. Dr. Cogswell testified that the victim died from malnutrition and dehydration due to starvation. Based on his findings at autopsy, Dr. Cogswell estimated that the victim was deprived of nutrition for at least a couple of months, but possibly six months or longer. Although the victim was more than two years old, he was the average height of a ten-month-old and only weighed as much as an average two-month-old at the time of his death. Dr. Cogswell explained that, due to his malnutrition and dehydration, the victim suffered flexion contractures on his left arm and leg; wasting of his muscle, soft tissue, and body fat; pulmonary edema due to heart failure; and that both his eyesight and hearing were impaired. In the days after the victim's death, Defendant gave several statements to detectives and the DCS investigator, in which he never claimed that he was estranged from

- 45 -

Mrs. Dotson, that he lived somewhere other than the Lerchen Road residence, or that he had not known about the condition of the victim.

Moreover, after discovering the victim, Defendant took steps to misdirect the investigators who would eventually arrive at the residence. Instead of calling 911, Defendant instructed Mrs. Dotson to help him clean the house before taking the victim to the hospital. Defendant put a fresh bottle in the Pack 'n Play to make it appear that the victim had been eating, and he started the washing machine in an attempt to clean the victim's clothing, which was saturated with feces and urine.

Taking the evidence in the light most favorable to the State, there was sufficient evidence to support the jury's verdict convicting Defendant of aggravated child abuse. Defendant is not entitled to relief.

## 2. Aggravated Child Neglect

The proof also established that Defendant knowingly neglected the victim so as to adversely affect the victim's health and welfare and that Defendant's neglect resulted in serious bodily injury to the victim. The testimony demonstrated that, despite his knowledge of the victim's condition, Defendant failed to intervene and seek medical attention for the victim and that this failure to obtain medical help resulted in bodily injury involving a substantial risk of death. *See Dorantes*, 331 S.W.3d at 384 ("[T]he defendant's failure to seek medical assistance for the victim's injuries may have supported convictions for aggravated child neglect and felony murder by aggravated child neglect.") Dr. Cogswell stated that the victim's starvation would not have been obvious at the beginning but would have accelerated toward the end and become ever more apparent. He testified that, at the time of his death, the victim had sunken eyes; visible cheekbones, ribs, and arm bones; very little muscle mass; and wasted buttocks cheeks. The victim also had ichthyosis and decubitus ulcers on multiple parts of his body. Dr. Cogswell testified that the victim's sunken eyes and wasted facial muscles would have been readily apparent even when the victim was clothed.

Although Defendant claimed at trial that he did not see the victim in the months leading up to his death, Defendant indicated to detectives that he lived at the Lerchen Road residence with Mrs. Dotson and their children and that he usually spent the night at that residence. Defendant said that he first noticed the victim's weight loss in November or December, and then noticed the victim was getting thinner a month and a half before his death. Defendant told the DCS investigator that he came home almost every night, that he checked on the victim every night, and that he had seen the victim looking as he did on the day of his death. Defendant admitted to the DCS investigator that he knew the victim was sick and in bad shape but insisted that it was Mrs. Dotson's job to take care of the victim.

Supporting Defendant's early statement to law enforcement and DCS, Mrs. Dotson testified that Defendant lived with her while the victim was sick. When asked if Defendant looked in on the children, Mrs. Dotson responded, "Yes. I mean, he was there around all of us." Mrs. Dotson testified that Defendant knew the victim was sick, that she spoke to him about the victim's health, and that they kept the victim's condition to themselves. Mrs. Dotson also testified that she spoke to Defendant once or twice a week about taking the victim to a doctor but that Defendant refused because the victim looked too bad to see a doctor.

The jury also heard testimony from Dr. Cogswell that the victim's conditions were potentially survivable had he been taken to the hospital in mid-April. The evidence presented at trial was sufficient to support Defendant's conviction for aggravated child neglect either as the principal offender or as one criminally responsible for the conduct of Mrs. Dotson. Defendant, therefore, is not entitled to relief.

### 3. First Degree Felony Murder

Finally, the evidence showed that the victim was killed in the perpetration of aggravated child abuse and aggravated child neglect. As described above, the evidence supported the jury's determination that Defendant was guilty of aggravated child abuse and aggravated child neglect. Dr. Cogswell testified that the victim died as a result of his starvation and neglect, so the evidence supported the jury's verdict on the felony murder counts. *See Dorantes*, 331 S.W.3d at 384.

On appeal, Defendant essentially requests that this court make its own credibility determinations and reweigh the evidence presented at trial. However, this court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *Smith*, 436 S.W.3d at 764. Defendant is not entitled to relief on this claim.

### *E. Merger of Offenses*

Although not raised by either party, we discern an issue with the trial court's merger of offenses. First, we note that the trial court should have merged the first degree felony murder convictions in Counts 2 and 3. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) ("Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction . . . ."). Additionally, the trial court should not have merged Defendant's convictions for aggravated child abuse in Count 4 and aggravated child neglect in Count 5 into their corresponding felony murder convictions in Counts 2 and 3. Aggravated child abuse and aggravated child neglect are not lesser-

included offenses of felony murder, and dual convictions for those offenses are permitted. *State v. Godsey*, 60 S.W.3d 759, 774-75 (Tenn. 2001) ("Where a 'legislature explicitly states that a particular felony is a predicate felony for felony-murder, no "merger" occurs.'"); *State v. Donald Lee Harris*, No. M2018-01680-CCA-R3-CD, 2019 WL 5704185, at *13 n. 1 (Tenn. Crim. App. Nov. 5, 2019) (noting the clear legislative intent to allow cumulative punishment for aggravated child abuse or aggravated child neglect and felony murder in the perpetration of those offenses and stating that dual convictions are permissible in this context), *perm. app. denied* (Tenn. Mar. 26, 2020). Accordingly, we remand for entry of amended judgments of conviction reflecting that Count 3 merges into Count 2, that Count 4 does not merge with Count 2, and that Count 5 does not merge with Count 3. Because we have concluded that Counts 4 and 5 should not be merged into Counts 2 and 3, the trial court should impose sentences in Count 4 and Count 5 upon remand.

### III. Conclusion

Based on the foregoing, we remand for entry of amended judgments properly effectuating the merger of offenses as outlined in this opinion and for imposition of sentences in Counts 4 and 5. The judgments of the trial court are affirmed in all other respects.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 48 -